## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No. 16-11424 (___) |
| Debtor in a Foreign Proceeding. | |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND RELATED RELIEF

Svitlana Romanova is the duly appointed foreign representative (the "**Foreign Representative**") of Metinvest B.V. (the "**Debtor**"), a private limited liability company incorporated under the laws of the Netherlands, in connection with a proceeding (the "**English Proceeding**") concerning a scheme of arrangement (the "**Scheme**")[2] under part 26 of the English Companies Act 2006 (as amended, the "**English Companies Act**") currently pending before the High Court of Justice of England and Wales (the "**High Court**").

The Foreign Representative has commenced this case ancillary to the English Proceeding and respectfully files this *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**") seeking, pursuant to sections 105(a), 1507, 1515, 1517, and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"), the entry of an order, in the form of the proposed order (the "**Proposed Order**") annexed hereto as Exhibit A, (i) recognizing the English Proceeding as a "foreign nonmain proceeding" under section 1517 of the Bankruptcy Code, and (ii) giving full force and effect to the Scheme in the United States if such Scheme is

---

[1]   The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839.  The address of the registered office of Metinvest B.V. is Nassaulaan 2A, 2514 JS, 'S-Gravenhage, The Netherlands.

[2]   Capitalized terms used but not defined herein shall have the meanings assigned to them in the Scheme.  A copy of the Scheme, and certain other documents relating to the Scheme, are attached as exhibits to the *Declaration of Daniel J. Guyder In Support of Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Guyder Declaration**") dated June 8, 2016 and filed contemporaneously herewith.

duly approved by the requisite majority of affected creditors and sanctioned by an order of the High Court (the "**Sanction Order**") in accordance with the English Companies Act.

As described in the Convening Order of the High Court dated June 8, 2016 (the "**Convening Order**"),[3] a meeting of affected creditors to vote on the Scheme will be held on June 28, 2016 (the "**Scheme Meeting**") and a hearing to consider whether to sanction the Scheme and thereby make it binding in England and Wales is scheduled for June 30, 2016 (the "**Sanction Hearing**").   A non-binding heads of terms for a restructuring (the "**Non-Binding Restructuring Heads of Terms**") of the Notes (as defined below) and the PXF  Facilities (as defined below) was agreed between an ad hoc committee of holders of the Notes and a coordinating committee of lenders under the Debtor's PXF Facilities on May 24, 2016.  A copy of the Non-Binding Restructuring Heads of Terms was appended to the practice statement letter (the "**PSL**")[4] in relation to the Scheme which was circulated to, among others, holders of the Notes on May 25, 2016 and is also appended to the Scheme.

The purpose of the Scheme is to continue a moratorium on enforcement action by holders of the Notes in respect of the Notes until September 30, 2016 (subject to extension to November 30, 2016 at the latest, or early termination in each case in accordance with terms in the Scheme) in order to maintain stability of the Metinvest Group (as defined below) during the period in which the parties agree to the documentation for, and implementation of, the restructuring proposal set out in the Non-Binding Restructuring Heads of Terms.  The Foreign Representative is filing the Petition prior to the Sanction Hearing and entry of the Sanction Order in an effort to align this ancillary case as closely as possible with the foreign proceeding and ensure seamless implementation of the Scheme.   The relief requested by the Foreign

---

[3]     A copy of the Convening Order is annexed as <u>Exhibit B</u> to the Guyder Declaration.

[4]     A copy of the PSL is annexed as <u>Exhibit A</u> to the Guyder Declaration.

Representative with respect to the Scheme is conditioned on the prior entry of the Sanction Order by the High Court.  If the Sanction Order is entered, a copy will be promptly filed with this Court.

In support of the Petition, the Foreign Representative respectfully states as follows:

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) and (3) because the Debtor's principal asset in the United States is the shares of capital stock it owns in Metinvest U.S., Inc., a Delaware corporation, which is deemed to be located in Delaware,[5] and it is otherwise consistent with the interests of justice and convenience of the parties, having regard for the relief sought by the Foreign Representative.  The statutory predicates for the relief requested herein are sections 105(a), 1507, 1515, 1517, and 1521 of the Bankruptcy Code.

## BACKGROUND

*Procedural Posture*

1.    On January 13, 2016, the Foreign Representative filed a petition in this Court seeking, among other things, enforcement of the Debtor's scheme of arrangement (the "**Initial Scheme**") under the English Companies Act which was sanctioned by the High Court on January 29, 2016.  On February 8, 2016, this Court approved the petition and entered an order giving full force and effect to the Initial Scheme in the United States.  *See In re Metinvest B.V.*,

---

[5]    8 Del. C. Section 169.

Case No. 16-10105 (LSS) (Bankr. D. Del. Feb. 8, 2016) [D.I. 34].[6]  The Initial Scheme provided for a moratorium against enforcement action by holders of the Notes in respect of certain events of default through May 27, 2016 and was intended to provide the stability necessary for the Debtor to negotiate a comprehensive restructuring of its indebtedness to preserve operations for the benefit of all stakeholders.

2.        On May 27, 2016 the Initial Scheme and the contractual standstill in relation to the PXF Facilities (as described below) (the "**PXF Standstill Extension**") expired in accordance with their terms.  The Debtor has requested an extension to the PXF Standstill Extension which it expects will be conditional on a moratorium being in place in relation to the Notes.  The Debtor intended to have established extended moratorium arrangements for the Notes from and including May 27, 2016.  However, the Non-Binding Restructuring Heads of Terms were not agreed between the ad hoc committee of holders of the Notes and the coordinating committee of lenders under the Debtor's PXF Facilities and the Debtor until May 24, 2016 and therefore it was not possible to issue the PSL until May 25, 2016.  This is the reason for the delay between the expiry of the Initial Scheme and the implementation of the Scheme (assuming the Scheme is approved by the Scheme Creditors (as defined below) and sanctioned by the High Court).

3.        The Debtor considers that the longer standstill and moratorium arrangements are not in place in respect of the PXF Facilities and the Notes respectively, the more it is exposed to a risk of creditor action which could destabilize the Metinvest Group and disrupt the restructuring process.  Therefore, the Debtor intends to put in place new standstill and

---

[6]     On January 29, 2016, this Court entered an order enforcing the Initial Scheme on a provisional basis pursuant to sections 105(a) and 1519 of the Bankruptcy Code to avoid a gap in protection arising from the 21-day notice period required by the Federal Rules of Bankruptcy Procedure and the sanctioning of the Initial Scheme by the High Court.  *In re Metinvest B.V.*, Case No. 16-10105 (LSS) (Bankr. D. Del. January 29, 2016) [D.I. 28].

moratorium arrangements as soon as possible to reduce this risk.  Accordingly, in relation to the Notes and the Scheme, the anticipated effective date for the Scheme is June 30, 2016.  As described above, the Non-Binding Restructuring Heads of Terms were agreed on May 24, 2016. Accordingly, the Debtor has commenced this Scheme to provide the further time necessary to document and implement the restructuring proposal set out in the Non-Binding Restructuring Heads of Terms and to continue the effect of the moratorium through September 30, 2016 (subject to extension through November 30, 2016 at the latest, or early termination in each case pursuant to the terms of the Scheme).[7]  Apart from the extension of the moratorium period, the substance of the Scheme is substantially the same as the Initial Scheme enforced by this Court pursuant to its February 8, 2016 order.

***The Debtor***

    A.    <u>Business of the Debtor</u>

    4.    The Debtor and its subsidiaries (the "**Metinvest Group**") are, collectively, the largest vertically integrated mining and steel business in Ukraine, operating assets in each stage of the production chain from iron ore mining and processing, coking coal mining and coke production, through to semi-finished and finished steel production, pipe and coil rolling and production and manufacturing other value-added products.

    5.    The Debtor was incorporated under the laws of the Netherlands on May 21, 2001 and is the ultimate holding company of the Metinvest Group.  As a holding company, its primary assets consist of its shares in its subsidiaries, intercompany receivables, and cash in its bank accounts.  The Debtor has no revenue generating operations of its own, and

---

[7]   *See* Scheme §§ 3.5-3.6.

therefore its cash flow and ability to service its indebtedness are dependent on the operating performance and financial condition of its operating subsidiaries.[8]

B.      Operations

6.      The Metinvest Group's business is divided into two divisions: (i) metallurgical and (ii) mining.  For the year ended December 31, 2015, the metallurgical segment accounted for approximately 79% of the Metinvest Group's external revenues, while the mining segment accounted for 21% of the Metinvest Group's external revenues.

i.      *The Metallurgical Division*

7.      The metallurgical division is responsible for the Metinvest Group's steel and coke products.  Its principal products include (i) finished steel products such as flat and long steel products and pipes, (ii) semi-finished steel products such as pig iron, slabs and billets, and (iii) coke.  The metallurgical division is comprised of thirteen key subsidiaries:

- Ilyich I&SW - the fourth largest Ukrainian integrated steel producer;

- Azovstal - the third largest Ukrainian steel producer;

- Yenakiieve I&SW - a fully integrated steel producer located in Ukraine;

- Makiivka Steel - a producer of shapes and bars located in Ukraine;

- Khartsyzk Pipe - a producer of large diameter pipes located in Ukraine;

- Ferriera Valsider - a producer of plates and coils located in Italy;

- Promet Steel - a producer of shapes and bars located in Bulgaria;

- Metinvest Trametal and Spartan UK - producers of plates located in Italy and in the United Kingdom, respectively;

---

[8]     An organizational chart detailing the structure of the Metinvest Group is attached as Exhibit E to the Guyder Declaration.

- <u>Avdiivka Coke, Donetsk Coke and Zaporizhia Coke</u> - producers of coke and chemicals located in Ukraine; and

- <u>Inkor Chemicals</u> - a producer of refined naphthalene and phenol and cresol products located in Ukraine.

8.    The Debtor's steel production business is conducted primarily through these subsidiaries.  The metallurgical division also comprises Metinvest-Resource, a scrap metal company.  In the year ended December 31, 2015, the metallurgical division's external revenues and adjusted EBITDA were $5.4 billion and $486 million, respectively.[9]

ii.    *The Mining Division*

9.    The Debtor's mining division encompasses its iron ore and coal mining businesses. The Debtor's key products in this division are merchant iron ore concentrate and pellets, and coking coal concentrate.  The Debtor has six key subsidiaries in the mining division:

- <u>Northern GOK and Ingulets GOK</u> - the second and third largest iron ore mining companies in Ukraine by production volume in 2015;

- <u>Central GOK</u> - the sixth largest iron ore mining company in Ukraine by production volume in 2015;

- <u>Komsomolske Flux Plant</u> - a producer of fluxing limestone located in the Donetsk region of Ukraine;

- <u>Krasnodon Coal</u> – a producer of coking coal located in the Luhansk region of Ukraine; and

- <u>United Coal Company</u> - a producer of coking coal based in the United States.

In the year ended December 31, 2015, the mining division's external revenues and adjusted EBITDA were $1.4 billion and $88 million, respectively.

---

[9]    All amounts are denoted in USD unless explicitly stated otherwise.

iii.    *Trading and Logistics*

10.    The Debtor's trading and logistical assets serve both the metallurgical and mining divisions.  The Debtor sells steel, iron ore and coke and coal products to international markets in Europe, the Middle East, North Africa and South East Asia through Metinvest International S.A., to the Ukrainian market through Metinvest Ukraine and Metinvest-SMC; and to Commonwealth of Independent States markets (primarily Russia and Belarus) through Metinvest Ukraine, Metinvest Eurasia and Metinvest Distribution.  In addition, Metinvest-Shipping, a company based in Mariupol, Ukraine provides transportation and forwarding services for the Debtor's cargoes by railway and for their transhipment via sea ports. Belgorodmetallosnab provides warehouse and transhipment services for the Debtor in Russia.

C.    Ownership

11.    The Debtor is owned 71.24% by System Capital Management Limited (Cyprus) ("**SCM**"), a holding company registered in Cyprus, and 23.76% by the group of companies related to the SMART Group Ltd. ("**SMART**"), a company organized under the laws of Ukraine.  The remaining 5% has been acquired from the previous owners of the Ilyich Group,[10] which the Debtor acquired in 2010, for the benefit of SCM and SMART.  SCM is a member of the SCM Group, which is one of Europe's leading industrial groups with controlling interests in over 100 companies operating in the energy, finance, telecommunications, oil, clay mining, retail, real estate, media, agricultural, transportation and engineering sectors.  SMART is a diversified holding company with holdings in metals and mining, oil and gas, banking, agriculture, ship building and real estate.

---

[10]    The Ilyich Group was comprised of Ilyich Iron and Steel Works and Ilyich-Steel.

D.    Debt Structure

12.    The Debtor's primary obligations are (i) three series of Eurobond notes issued in May 20, 2010, February 14, 2011, and November 28, 2014 with an aggregate outstanding principal amount of approximately $1.18 billion (the "**Notes**");[11] and (ii) four pre-export finance facilities obtained in 2011, 2012, and 2013 with an aggregate principal amount outstanding of approximately $1.1 billion (the "**PXF Facilities**").[12]

13.    The Notes are unsecured obligations of the Debtor ranking *pari passu* as among themselves and have the benefit of a suretyship issued on a joint and several basis by certain of the Debtor's subsidiaries located in Ukraine (the "**Guarantors**").[13]   The Notes also have the benefit of suretyships granted by Ilyich I&SW by way of deed poll in favor of the 2016 Notes Trustee, the 2017 Notes Trustee and the 2018 Notes Trustee (each term as defined below) dated April 1, 2016 to guarantee the due payment of all sums expressed to be payable by the Debtor under the applicable series of Notes and the provisions of the applicable trust deed insofar as they relate to those Notes.

14.    The Notes are governed by English-law trust deeds (the "**Trust Deeds**") with BNY Mellon Corporate Trustee Services Limited acting as trustee for the 2016 Notes (as defined below) (the "**2016 Notes Trustee**") and GLAS Trust Corporation Limited acting as trustee for the 2017 Notes (as defined below) (the "**2017 Notes Trustee**") and the 2018 Notes (as defined below) (the "**2018 Notes Trustee**," and together with the 2016 Notes Trustee and the

---

[11]   Amount calculated as of May 27, 2016 and includes capitalization of unpaid interest in accordance with the Initial Scheme.

[12]   Amount calculated as of May 27, 2016 and includes capitalization of unpaid interest in accordance with a standstill agreement in respect of the PXF Facilities.

[13]   The Guarantors include the following entities: Avdiivka Coke Plant, Ingulets Iron Ore Enrichment Works, Khartsyzsk Pipe Plant, Central Iron Ore Enrichment Works, Northern Iron Ore Enrichment Works, Azovstal Iron & Steel Works, Yenakiieve Iron and Steel Works, and Metalen.

2017 Notes Trustee, the "**Trustees**").  The notes issued on May 20, 2010, were issued in an aggregate principal amount of $500 million ($88,477,264.89 remains outstanding),[14] bear an interest rate of 10.25% and matured on January 31, 2016 (the "**2016 Notes**"); the notes issued on February 14, 2011 were in an aggregate principal amount of $750 million ($786,774,642.39 remains outstanding),[15] bear an interest rate of 8.75%, and mature on February 14, 2018 (the "**2018 Notes**"), and the notes issued on November 28, 2014 were in an aggregate amount of approximately $289.7 million ($300,531,520.44 remains outstanding),[16] bear an interest of 10.50% and are due and payable in four equal instalments the first of which fell due on May 28, 2016, and remains unpaid, with the remaining installments falling due on November 28, 2016, May 28, 2017, and November 28, 2017 (the "**2017 Notes**").

15.    The PXF Facilities are syndicated and in initial amounts of $1 billion, $560 million, $325 million and $300 million with an aggregate principal amount outstanding of approximately $1.1 billion.[17]   The PXF Facilities have the benefit of bank account pledges, security over sales proceeds, and suretyships from certain of the Debtor's subsidiaries (including Ilyich I&SW).  The PXF Facilities provide for monthly amortization installments.

16.    In addition to the Notes and PXF Facilities, the Debtor is liable for other obligations including: (i) a loan agreement with Deutsche Bank AG insured by Euler Hermes Export Credit Agency, dated August 6, 2012, for an initial aggregate amount of approximately

---

[14]    Amount calculated as of May 27, 2016 and includes capitalization of unpaid interest in accordance with the Initial Scheme.

[15]    Amount calculated as of May 27, 2016 and includes capitalization of unpaid interest in accordance with the Initial Scheme.

[16]    Amount calculated as of May 27, 2016 and includes capitalization of unpaid interest in accordance with the Initial Scheme.

[17]    Amounts calculated as of May 27, 2016 and includes capitalization of unpaid interest in accordance with the Initial Scheme, a standstill agreement in respect of the PXF Facilities, and an extension to such standstill agreement.

€24.6 million of which approximately €19.6 remains outstanding (the "**ECA Facility**"),[18] (ii)

certain seller notes (the "**Seller Notes**")[19] with $89.6 million outstanding issued by Metinvest

U.S. Inc. and United Coal Company LLC ("**UCC**") and guaranteed by the Debtor in conjunction

with Metinvest U.S. Inc.'s acquisition of UCC in April 2009;[20] (iii) two non-bank loans obtained

from shareholder affiliates of the Debtor in 2014 with approximately $405 million in aggregate

outstanding (the "**Shareholder Loans**");[21] and (iv) the Debtor has various short term borrowings

from Metinvest International S.A., advanced between September 2014 and January 2015 which

mature on June 30, 2016 (the "**MISA Loan**").[22]   The Metinvest Group also relies on various

short-term trade finance facilities for purchases of inventory and receivables.[23]

---

[18]   Amount calculated as of May 31, 2016.

[19]   Amounts calculated as of May 31, 2016.

[20]   On January 10, 2015, UCC, Metinvest U.S. Inc. and other relevant parties entered into extension documentation with the holders of the Seller Notes and extended the maturity of the Seller Notes to the end of 2016.  Under the new terms and conditions, the outstanding amount of the Seller Notes were to be repaid during 2016 in 12 equal monthly installments commencing January 31, 2016.  Since January 2016, the Debtor has been in negotiations with the holders of the Seller Notes regarding a further rescheduling of the repayment.  During this period, the Debtor has received signed waivers from the holders of the Seller Notes in relation to the non-payment of principal instalments.  The current waiver expires on June 30, 2016.  Interest payments are currently paid in full on a monthly basis.  The Debtor anticipates that the issuers of the Seller Notes will remain unable to meet the scheduled payments under the Seller Notes which fall due prior to the Termination Date (as defined in the Scheme).  However, the Debtor is currently in discussions with the holders of the Seller Notes in connection with a proposed amendment agreement to the Seller Notes for the extension of the maturity of the Seller Notes.  Accordingly, the Seller Notes are not subject to the Scheme.

[21]   Amount calculated as of May 31, 2016.  The Debtor has informed these shareholders that it does not intend to repay any principal under these loans and would only pay certain accrued interest thereon after the Termination Date (as defined in the Scheme), subject to the terms of the Scheme.  The Debtor anticipates that it will obtain a waiver from these shareholders in relation to any non-payment during the moratorium period and therefore the Shareholder Loans are not subject to the Scheme.  On April 1, 2016 the Debtor, Rainwell Limited and Eltrano Investments Limited entered into certain arrangements the effect of which granted turnover subordination of the Shareholder Loans pro rata in respect of the aggregate principal (including capitalized or compounded interest, as the case may be) amounts outstanding under the Notes and the PXF Facilities as of February 15, 2016.  These subordination arrangements expired on May 27, 2016.  Subordination arrangements will be put in place in relation to the Notes and the Scheme and in relation to the PXF Facilities and the extension to the PXF Standstill Extension.

[22]   If the Scheme is implemented, the Debtor anticipates that the MISA Loan will be further rescheduled to a date on or after the Termination Date so the MISA Loan is not subject to the Scheme.

[23]   As of June 2, 2016, the Metinvest Group had $158 million outstanding under trade finance facilities.  The trade finance facilities are drawn primarily by Metinvest International S.A., the main operating subsidiary of the Metinvest Group.  The trade finance facilities are short term, uncommitted, can be cancelled by the relevant banks on very short notice and do not permit redrawing amounts.  Further, they are secured by pledges of inventories and/or assignment of export proceeds.  Accordingly, the trade finance facilities are not subject to the Scheme.

E.    Establishment in the United Kingdom

17.    The Debtor is organized under the laws of the Netherlands and conducts its business with customers throughout the world through various operating subsidiaries primarily located in Ukraine.  The Debtor has a branch office, the Metinvest B.V. UK Branch (the "**UK Branch**"), with operations located in London.  The UK Branch:

- is registered at the Companies House of England and Wales;[24]

- has office space leased by the Debtor from SCM Advisors Limited located at 25 Park Lane, London, W1K 1RA, UK (the "**London Office**"), which lease includes the supply of utilities, necessary goods and services for the commercial operation of the London Office, including the procurement of office equipment, computers, and various telecommunications systems to integrate the UK Branch with the Metinvest Group and its global customer base;

- has a local bank account; and

- serves as the principal office for its Project Manager who provides corporate finance treasury services and additional services overseeing the restructuring and ongoing management of the Debtor's liabilities pursuant to a service agreement between the Debtor and Metinvest International S.A., a Swiss subsidiary of the Debtor.

18.    The Debtor also owns (directly or indirectly) three English operating subsidiaries: Spartan UK Limited, Metinvest Investments Limited, and Metinvest Capital UK Limited.  Further, the Notes are all governed by English law, as are the Trust Deeds and suretyships associated with the Notes, and each of the Trustees is located in London.  Indeed, virtually every aspect of the Notes is governed by English law.  If there is a dispute over the Trustees' compensation, it is to be decided by an expert selected by the President of The Law Society of England and Wales.  Further, the 2017 Notes and the 2018 Notes are governed by arbitration clauses calling for arbitration "under the London Court of International Arbitration, Arbitration Rules" and providing that the location of any arbitration "shall be London, England

---

[24]    The UK Branch is registered with establishment number BR017685.

and the language of the arbitration shall be English." In addition, under the 2016 Notes and the

2018 Notes, the relevant Trustee has the option of proceeding by way of litigation, in place of

arbitration. In connection with this option, the Debtor has irrevocably submitted to jurisdiction

in England before English courts. Finally, the Foreign Representative was duly appointed by the

High Court in London.[25]

*Financial Difficulties*

19.    A significant portion of the Metinvest Group's assets is located in

Ukraine. The substantial and on-going civil disturbances, political instability, and military action

in the country since the end of 2013 have negatively impacted Ukraine's economy, and as a

result, the Metinvest Group's business, results of operations and financial condition. These

events have: (i) damaged and destroyed transport infrastructure, disrupting deliveries of raw

materials and shipments of finished goods from some of the Metinvest Group's plants and even

resulted in the death of at least one employee at a plant as a result of military shelling; (ii) caused

production volumes of steel, iron ore, coke and coal products to decline; and (iii) affected

economic activity and, as a result, domestic demand for steel and iron ore products. In addition,

the Metinvest Group has suffered from the protracted depressed market prices for coal and iron

ore throughout much of 2014 and into 2015. Since February 2016, steel, iron ore and coking

coal prices have recovered to some extent but have remained volatile. The Debtor, in line with a

number of other market participants, does not expect the recent recovery in prices to be

sustainable in the medium term. Further, the Debtor has been unable to obtain funding at this

time from the international capital and debt markets to refinance existing indebtedness. The

combination of decreased earnings from operations and the inability to raise new capital has

---

[25]    *See* Expert Report of Professor Stephen J. Lubben attached as <u>Exhibit D</u> to the Guyder Declaration.

created a liquidity crisis for the Debtor.  The Debtor does not expect any material and sustainable improvement in its overall liquidity before 2018.

*Restructuring Efforts*

      A.     <u>Defaults under the PXF Facilities and the Notes</u>

      20.     As a consequence of the continued civil disturbances, political instability, and depressed market prices for iron ore and steel, the Debtor has been unable to pay in full the monthly amortization installments under the PXF Facilities since February 10, 2015 causing payment defaults under the PXF Facilities in a total amount of approximately $787 million[26] (the "**PXF Defaults**") and providing grounds for the lenders under the PXF Facilities (the "**PXF Lenders**") to accelerate all amounts outstanding under the PXF Facilities.  The Debtor is liable to make further scheduled debt repayments under its PXF Facilities from June 8, 2016 to November 30, 2016 totaling approximately $126 million, unless a restructuring is implemented prior to that date.

      21.     Due to cross default provisions in the Notes, which provide that a payment default in an amount equal to or exceeding $50 million is an event of default under the Notes, the PXF Defaults caused the Debtor to be in default with respect to the Notes and the additional non-payment defaults and corresponding cross defaults outlined below have occurred and are continuing in relation to the Notes (the "**Notes Defaults**" together with the PXF Defaults, the "**Defaults**").[27]  The Notes Defaults rendered the Notes susceptible to acceleration by the relevant

---

[26] Due to a typographical error, paragraph 13 of the PSL referred to $890 million as of May 25, 2016.

[27] The PXF Defaults also caused cross-defaults under the ECA Facility, which were initially waived until June 30, 2015 and then extended several times until June 30, 2016.  A principal payment under the ECA Facility in the amount of approximately €1.5 million will fall due prior to November 30, 2016.  On the basis the Debtor anticipates that it will obtain further bilateral waivers of cross defaults under the ECA Facility, the ECA Facility is not subject to the Scheme.

Trustee in its sole discretion, upon the request of one-fifth of the outstanding holders of the relevant Notes, or pursuant to an extraordinary resolution of the relevant noteholders.

22.     Following the non-payment of the principal amount of the 2016 Notes which fell due on January 31, 2016, a payment default is currently outstanding in respect of the 2016 Notes and corresponding cross defaults occurred under the 2017 Notes and the 2018 Notes. Although, the Initial Scheme placed a moratorium on creditor action in respect of the Notes through May 27, 2016, a proportion of interest due to the Noteholders during the moratorium period was capitalized and became due and payable immediately upon the expiry of the Initial Scheme causing another payment default in respect of each series of Notes.   An additional payment default occurred on May 28, 2016 by virtue of the non-payment of the instalment of principal due on the 2017 Notes.

23.     On December 1, 2015 the Debtor entered into a standstill agreement (effective as of December 22, 2015) with approximately 84% of the PXF Lenders (the "**PXF Standstill**") which provided for forbearance on enforcement action or the initiation of insolvency proceedings by the PXF Lenders who signed the PXF Standstill until January 29, 2016.  The PXF Standstill was extended in accordance with its terms by the PXF Standstill Extension through May 27, 2016.  The Debtor is seeking an extension of the PXF Standstill Extension in accordance with its terms.

B.     The Non-Binding Restructuring Heads of Terms

24.     The Debtor first circulated a proposal to restructure its outstanding obligations under the PXF Facilities and Notes on November 20, 2015.  Negotiations with the PXF Lenders and holders of the Notes have been on-going and significant progress was made during the moratorium obtained from the Initial Scheme and the PXF Standstill Extension.

Indeed, on May 24, 2016, the Debtor agreed to the Non-Binding Restructuring Heads of Terms[28] with an ad hoc committee of Noteholders and a coordinating committee of PXF Lenders.[29]

25.    In summary, the Non-Binding Restructuring Heads of Terms provide for a restructuring of the PXF Facilities and the Notes involving the following key terms (among others):

- the replacement of the PXF Facilities (including unpaid interest which has been capitalized in accordance with the PXF Standstill Extension (and the proposed extension thereof), the Initial Scheme and the Scheme) with a single new pre-export finance facility (the "**New PXF Facility**") with a final maturity date of June 30, 2021;

- the replacement of each series of Notes (including unpaid interest which has been capitalized in accordance with the Initial Scheme and the Scheme) with a single series of new notes (the "**New Notes**") with a final maturity date of December 31, 2021;

- the coupon payable under the New Notes will be increased compared to the weighted average life of the coupon payable under the Notes.  During an initial period beginning on the implementation of the restructuring until December 31, 2018, the Debtor will pay 30% of the interest due under the New PXF Facility and, in respect of the New Notes, will pay approximately 30% of the weighted average coupon under the Notes, in each case in cash, with the remainder to be capitalised and/or paid in cash pursuant to a cash sweep mechanic based on unrestricted cash balances of the Metinvest Group;

- from January 1, 2019 ("**Period 2**"), the entire amount of the coupon and interest due under the New Notes and the New PXF Facility will be paid in cash;

- in Period 2, the New PXF Facility will benefit from scheduled amortisation;

- the Shareholder Loans and other liabilities of the Metinvest Group to the shareholders of the Debtor and their affiliates will be subordinated to the New Notes and the New PXF Facility;

---

[28]    A copy of the Non-Binding Restructuring Heads of Terms is included as Appendix 1 to the PSL attached as Exhibit A to the Guyder Declaration.

[29]    As at May 15, 2016, the ad hoc committee of Noteholders held in aggregate approximately 53% of the outstanding Notes by value (based on the principal amount of Notes outstanding as at April 15, 2016).  The coordinating committee of PXF Lenders holds approximately 60% of the aggregate amount outstanding under the PXF Facilities.

- the security and guarantee package in favour of the New PXF Facility and the New Notes will be improved, including pledges on shares of some material operating companies and asset security;

- there will be limitations on dividends and other payments to shareholders and a tightening of the covenant packages under the New Notes and the New PXF Facility; and

- there will be no debt write off of the Notes or the PXF Facilities.

26.     The Debtor anticipates that the restructuring of the Notes and the PXF Facilities contemplated by the Non-Binding Restructuring Heads of Terms will be implemented on or prior to September 30, 2016 and, in any event, by November 30, 2016 at the latest. Accordingly, the Debtor is seeking an extension of the PXF Standstill Extension in accordance with its terms and to implement the proposed temporary moratorium under the Scheme in respect of the Notes while it agrees to the documentation for and implements the restructuring proposal set out in the Non-Binding Restructuring Heads of Terms.  For the avoidance of doubt, the Scheme only affects holders of the Notes.  A vote in favor of or against the Scheme is not a vote in favor of or against the Non-Binding Restructuring Heads of Terms.  If the Debtor is successful in agreeing to and documenting a final restructuring during the moratorium period under the Scheme, Noteholders will be requested to vote in relation to that restructuring in a further scheme of arrangement.

27.     The Debtor considers that such a stable platform to conduct negotiations with its creditors is critical to enable it to continue operations and maintain access to vital trade finance facilities during the period in which the restructuring proposal set out in the Non-Binding Restructuring Heads of Terms is documented and implemented.

*The Scheme*[30]

28.     In effect, the Scheme is a prelude to a more comprehensive debt restructuring that, for now, defers collection and enforcement action through a standstill to allow discussions with creditor constituencies to continue.   The Scheme provides the stability necessary for the Debtor to finalize the restructuring set out in the Non-Binding Restructuring Heads of Terms and preserve operations for the benefit of all stakeholders.   Specifically, the Scheme provides that the holders of the Notes, the Trustees, and the depository trust company holding the Notes (each a "**Scheme Creditor**" and collectively, the "**Scheme Creditors**") will not: (i) institute any step, action or proceeding against the Debtor, the Guarantors, Ilyich I&SW or any of their subsidiaries to enforce the terms of the Notes, Trust Deeds, surety agreements, any suretyships granted by Ilyich I&SW and guarantees related to the Notes, (ii) give written notice to the Debtor that any of the Notes are immediately due and payable or demand payment of any principal amounts under the Notes or any amount of interest which is not payable in accordance with the Scheme, or (iii) make a demand under the terms of any guaranty or suretyship or surety agreements (including suretyships granted by Ilyich I&SW) made in connection with the Notes (collectively, the "**Moratorium**").

29.     Pursuant to the Scheme, the Moratorium will be effective until the termination date which will occur at the earliest of: (i) September 30, 2016 (subject to extension through November 30, 2016 at the latest, or early termination pursuant to the terms of the Scheme), (ii) the date of the occurrence of an undeclared default (being any events of default other than events of default identified by the Debtor as declared defaults in the Scheme), (iii) the date of the occurrence of a breach of Scheme undertaking referred to below which is not

---

[30]   The summary of the Scheme provided in this section is for informational purposes only and is qualified in its entirety by the terms of the Scheme.

remedied within the applicable remedy period, (iv) the date on which any principal amount of the PXF Facilities is paid to the PXF Lenders (except as a result of it becoming unlawful for any amount to remain outstanding to a PXF Lender) during the period commencing on the effective date of the Scheme to and including November 30, 2016 unless the Debtor deposits an equal amount in a trust account for the Noteholders within 10 days, and (v) the date the Debtor announces a restructuring proposal for the Notes that is not consistent with the Non-Binding Restructuring Heads of Terms (subject to any changes approved in writing by Noteholders holding at least 50.01% of the aggregate amount of the Notes, upon request of the Debtor) (collectively, the "**Termination Date**").

   30. Pursuant to the Scheme, the Debtor has agreed to a number of concessions and undertakings during the Moratorium, which if breached and not remedied in the specified period, will result in termination of the Scheme.  Specifically, the Debtor has undertaken to, among other things: (i) ensure that the Metinvest Group does not make any payments in respect of capital expenditure in any calendar month in an aggregate amount greater than $70 million and subject to the limits set out in the Non-Binding Restructuring Heads of Terms, (ii) provide a monthly report to the Noteholders, (iii) not make and prohibit its subsidiaries from making any Restricted Payments (as defined in the terms and conditions of the Notes) and any principal or interest payments on account of the Shareholder Loans, (iv) pay 30% of accrued and unpaid interest on the Notes and PXF Facilities on certain dates specified in the Scheme, (v) pay further amounts of such interest depending on the unrestricted cash balance of the Metinvest Group, (vi) not make any payment in respect of interest owing under any of the PXF Facilities except as expressly set forth in the Scheme unless any such payment is made in respect of both the Notes and the PXF Facilities pro rata based on the amounts of interest then accrued and unpaid, (vii) on

or before the effective date of the Scheme, procure that the lenders under the Shareholder Loans enter into an arrangement the effect of which will extend the previously granted turnover subordination in respect of the Notes, such arrangement only to become effective on the date that, and on substantially similar terms to, any arrangement the effect of which extends the previously granted turnover subordination in respect of the PXF Facilities until the termination date of the Scheme (or until such other date specified in any such new subordination arrangement) becomes effective, and (viii) will procure that no member of the Metinvest Group will, during the Moratorium, enter into any suretyship, grant any security or provide other credit support or credit enhancement in favor of the PXF Lenders unless it enters into, grants or provides, on substantially similar terms, a suretyship, security or other credit support or credit enhancement in respect of the Notes such that the Notes and the PXF facilities share pro rata based on their aggregate principal amounts outstanding, calculated as of May 27, 2016.

31.     As consideration for the Moratorium, the Scheme contemplates that the Debtor will: (i) pay to each Scheme Creditor within 10 days of the Scheme becoming effective a fee equal to $0.50 per $1,000 principal amount of Notes held by such Scheme Creditor, (ii) pay to each Scheme Creditor certain additional moratorium fees in respect of extensions of the moratorium period on certain dates to be set out in the Scheme, and (iii) agree that any amount of accrued but unpaid interest through the Termination Date shall continue to bear interest in accordance with the terms of the Notes and such capitalized interest, including interest capitalized pursuant to the Initial Scheme, will be due and payable on the Termination Date, or, if a restructuring contemplated by the Non-Binding Restructuring Heads of Terms is implemented and becomes effective, on the dates and in the manner set out in the definitive documentation in relation to such restructuring.

32.     If and when a restructuring in accordance with the Non-Binding Restructuring Heads of Terms becomes effective, the restructuring fees payable to the Noteholders under paragraph 12 of the Non-Binding Restructuring Heads of Terms shall be reduced in certain circumstances by reference to the fees payable to Noteholders referred to in the Scheme described in paragraph 31 above, in accordance with Annex 4 of the Non-Binding Restructuring Heads of Terms.

33.     If the Scheme is successfully implemented, all Scheme Creditors will be bound by the terms of the Scheme.  The successful implementation of the Scheme, together with a further extension of the PXF Standstill Extension, will provide the Debtor with a stable platform to negotiate a broader restructuring of the Notes, the PXF Facilities, and various other financial obligations of the Debtor.  Assuming that a restructuring as contemplated in the Non-Binding Restructuring Heads of Terms is agreed, the Debtor considers that the Metinvest Group has sufficient assets to enable its creditors to be repaid in full in accordance with the proposal set out in the Non-Binding Restructuring Heads of Terms.  Accordingly, the Scheme is an essential element of the Debtor's overall restructuring efforts.

34.     Failure to implement the Scheme could have dire effects on the Debtor and its creditors.  The Debtor would likely run out of liquidity due to a cessation of trade finance and supplier credit, and the operating entities of the Metinvest Group, most of which are based in Eastern Ukraine, may be forced to shut down some or all of their production facilities causing long lasting damage to the business and more likely leading them to cease trading.  In that event, the Debtor would need to consider filing for protective proceedings in the Netherlands, and certain creditors may be able to commence bankruptcy proceedings in the Netherlands or elsewhere.  If the Dutch courts granted the Debtor a suspension of payments, this would provide

the Debtor only a short window to seek to agree a restructuring.  However, there is a substantial risk that with multiple insolvency proceedings, the Metinvest Group would lose the majority, if not all, of its trade finance facilities and supplier credit, effectively eliminating its liquidity.  This could set the stage for a Ukrainian protective bankruptcy proceeding which may result in either distressed asset sales or the assets being nationalized.  Such distressed asset sales would likely be at forced sale values and materially lower than a going concern value due to the very limited buyers, if any, in the currently volatile Ukrainian market.  If the assets are nationalized, it is entirely uncertain how much value would be received.  In both the sale and nationalization scenarios, however, there is a substantial risk that the Debtor will not be able to pay its creditors in full and it is unclear what the quantum or timing of distributions would look like.

### The English Proceeding

35.     The Debtor commenced the English Proceeding by filing claim forms in respect of the Scheme with the High Court on June 8, 2016, and the Foreign Representative was appointed by the Debtor to act as foreign representative in any chapter 15 case commenced in the United States in respect of the Debtor.[31]  On June 8, 2016, following a hearing (the "**Convening Hearing**"), the High Court entered the Convening Order which, among other things: (i) authorized the Debtor to hold the Scheme Meeting for the purposes of considering and approving the Scheme by the Scheme Creditors, (ii) ordered that notice of the Scheme, together with an explanatory statement and proxy forms for voting at the Scheme Meeting, be made available to Scheme Creditors; and (iii) ordered that the Foreign Representative shall be appointed to act as a foreign representative in this chapter 15 case.  Specifically, the Convening Order authorized the

---

[31]    The Debtor issued the PSL on May 25, 2016 in accordance with the guidance set forth by the High Court in its Practice Statement dated April 15, 2002.  The purpose of the PSL was, among other things, to advise creditors of the objective of the Scheme and the Debtor's intentions to formally commence the English Proceeding proposing the Scheme to Noteholders.  The PSL was posted to the Scheme Website (as defined below) and an announcement of the PSL was made on the Irish Stock Exchange with a reference to the Scheme Website.

Foreign Representative to apply to a United States Bankruptcy Court for an order enforcing the Scheme and granting any other related relief under chapter 15 of the Bankruptcy Code.[32]

36.     Shortly following the Convening Hearing, and in accordance with the Convening Order, notice of the Scheme Meeting, the Scheme, a voting form (including guidance notes for the completing the voting form), and an explanatory statement (collectively, the "**Restructuring Documents**") will be provided to the Scheme Creditors via the Depository Trust Company, Euroclear and Clearstream Luxembourg.   In addition, copies of the Restructuring Documents will made available to all Scheme Creditors by Lucid Issuer Services Limited as information agent under the Scheme at www.lucid-is.com/metinvest (the "**Scheme Website**"). Finally, availability of the Restructuring Documents on the Scheme Website will be announced on the Irish Stock Exchange.

37.     The Scheme will become legally binding upon, *inter alia*, the following:

(a)     a vote in favor of the Scheme at the Scheme Meeting to be held in London on June 28, 2016 by a majority in number representing not less than 75% in value of voting Scheme Creditors;

(b)     the issuance by the High Court of the Sanction Order; and

(c)     delivery of the Sanction Order to the Registrar of Companies in England and Wales.

38.     Following the Scheme Meeting, and upon receiving the necessary votes in favor of the Scheme, the High Court will conduct the Sanction Hearing.   In an effort to align this chapter 15 case with the timing of the overall restructuring process and prevent enforcement action by Noteholders, the Foreign Representative is seeking the relief requested in this Petition to be heard on or shortly after the date of issuance of the Sanction Order.

---

[32]     Convening Order ¶ 25.

**RELIEF SOUGHT**

39.    By this Petition, the Foreign Representative seeks the following relief:

(A)    recognition, pursuant to section 1517 of the Bankruptcy Code, of the English Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code;

(B)    enforcement of the Scheme, including any modifications or amendments thereof, in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code; and

(C)    such other and further relief as is appropriate under the circumstances pursuant to sections 105(a), 1507, and 1521, of the Bankruptcy Code.

**BASIS FOR SUCH RELIEF**

40.    For the reasons more fully discussed in the *Memorandum of Law* filed contemporaneously herewith, the English Proceeding is entitled to recognition under section 1517 of the Bankruptcy Code because:

(A)    the English Proceeding is (i) a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code and (ii) a "foreign nonmain proceeding" within the meaning of section 1502(5) of the Bankruptcy Code because the English Proceeding is located in a jurisdiction where the Debtor maintains an "establishment" within the meaning of section 1502(2) of the Bankruptcy Code;

(B)    the Foreign Representative is a "person" within the meaning of section 101(41) of the Bankruptcy Code and a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code;

(C)    the Petition was filed in accordance with sections 1504 and 1509 of the Bankruptcy Code; and

(D)    the Petition meets the requirements of sections 1504 and 1515 of the Bankruptcy Code.

41.    Further, the Scheme should be given full force and effect in the United States as either "additional assistance" under section 1507 of the Bankruptcy Code or "appropriate relief" under section 1521, as such enforcement is necessary to give effect to the Scheme with respect to Scheme Creditors taking action in the United States.

42.    Granting the requested relief would not be manifestly contrary to the public policy of the United States, as prohibited by section 1506 of the Bankruptcy Code.  In fact, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, the circumstances satisfy the conditions for mandatory recognition of the English Proceeding under section 1517 of the Bankruptcy Code and for the enforcement of the Scheme under sections 1507 and 1521 of the Bankruptcy Code.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests that this Court grant the Petition and enter the Proposed Order recognizing the English Proceeding as a "foreign nonmain proceeding" and giving full force and effect to the Scheme in the United States, and grant such other relief as the Court deems just and appropriate in the circumstances.

Dated: Wilmington, Delaware
      June 8, 2016

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

By: _/s/ Joseph M. Barry_
Joseph M. Barry (Del. Bar No. 4221)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone (302) 571-6600
Facsimile (302) 571-1253
jbarry@ycst.com

-and-

**ALLEN & OVERY LLP**
Daniel Guyder
Mark Nixdorf
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
daniel.guyder@allenovery.com
mark.nixdorf@allenovery.com

_Attorneys for the Foreign Representative of the Debtor_

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Svitlana Romanova declares as follows:

I am the Chief Legal Officer and a member of the Executive Committee of Metinvest Holding LLC, and have been authorized to act as foreign representative of Metinvest B.V. I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**"). I have read the Petition, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _07_ day of June, 2016, in _Kyiv, Ukraine_

_____

Svitlana Romanova

**<u>EXHIBIT A</u>**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No. 16-11424 (___) |
| Debtor in a Foreign Proceeding. | **Re: D.I. _____** |

### ORDER GRANTING RECOGNITION AND RELATED RELIEF

**THIS MATTER** was brought before the Court by Svitlana Romanova, the duly appointed foreign representative (the "**Foreign Representative**") of Metinvest B.V. (the "**Debtor**"), a private limited liability company incorporated under the laws of the Netherlands, in connection with a proceeding (the "**English Proceeding**") concerning a scheme of arrangement (the "**Scheme**") under part 26 of the English Companies Act 2006 (as amended, the "**English Companies Act**") currently pending before the High Court of Justice of England and Wales (the "**High Court**").

The Foreign Representative filed a *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**") on June 8, 2016 commencing the above captioned chapter 15 case under chapter 15 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") and seeking the entry of an order (i) recognizing the English Proceeding as a "foreign nonmain proceeding" under section 1517 of the Bankruptcy Code and (ii) giving full force and effect to the Scheme, including any modifications or amendments thereof, in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code if such

---

[1]    The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839.  The address of the registered office of Metinvest B.V. is Nassaulaan 2A, 2514 JS, 'S-Gravenhage, The Netherlands.

Scheme is duly approved by the requisite majority of affected creditors and sanctioned by the High Court in accordance with the English Companies Act.

The Court has considered and reviewed the Petition and the other pleadings and exhibits submitted by the Foreign Representative in support thereof. After due deliberation and sufficient cause appearing therefor, the Court finds and concludes as follows:

(A) This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012, and section 1501 of the Bankruptcy Code.

(B) This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P) and the Court may enter a final order consistent with Article III of the United States Constitution.

(C) Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) and (3).

(D) The Foreign Representative is a "person" within the meaning of 11 U.S.C. § 101(41) and is the duly appointed "foreign representative" of the Debtor within the meaning of 11 U.S.C. § 101(24).

(E) The chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504 and 1509, and the Petition meets the requirements of 11 U.S.C. §§ 1504 and 1515.

(F) The English Proceeding is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

(G) The English Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

(H) The English Proceeding is before the High Court in London, England, where the Debtor has an "establishment" within the meaning of 11 U.S.C. § 1502(2), and therefore constitutes a "foreign nonmain proceeding" pursuant to 11 U.S.C. § 1502(5) and is entitled to recognition as such pursuant to 11 U.S.C. § 1517(b)(1).

(I) The Foreign Representative is entitled to discretionary relief pursuant to 11 U.S.C. §§ 1507 and 1521.

(J) The relief granted herein is necessary and appropriate, in the interest of the public and international comity, and consistent with the public policy of the United States.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.      The English Proceeding is hereby recognized as a foreign nonmain proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

2.      The Scheme, including any amendments or modifications, is hereby given full force and effect in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code.

3.      This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any request for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

4.      The Petition and supporting papers shall be available upon request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020 to the attention of Mark Nixdorf, (212) 610-6421, mark.nixdorf@allenovery.com.

5.      Notwithstanding Bankruptcy Rule 7062, made applicable to this chapter 15 case by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

Dated: Wilmington, Delaware
        _____, 2016

                              _____
                              UNITED STATES BANKRUPTCY JUDGE

01:18761970.2

3